Gibson *et al. vs* Armstrong; and Armstrong *vs* Gibson *et al.*

ERROR TO THE MASON CIRCUIT.

*Church case. Deed. Trusts.*

CHANCERY.

| 7bm | 481 |
| 112 | 523 |

| 7bm481 | |
| 113 | 30 |

*Case* 127.

| 7bm | 481 |
| 129 | 393 |

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

*July* 27.

| 7bm481 | |
| e131 | 476 |
| f131 | 479 |

THIS record presents a contest between two portions of the former congregation of members of the Methodist Episcopal Church at Maysville, each claiming, as a distinctly organized society or congregation, the exclusive use and control, for the purposes of worship, of the Methodist Meeting House or Church building, and the lot on which it is situated, in the city of Maysville. The opposing claims of the two parties, were brought into immediate conflict, by appointments made and published, under different authorities, for preaching and Divine worship, at the same hour of the same day, and in the same Church, by two different preachers, for each of whom the parties respectively claimed the use of the pulpit. To prevent collision and with the intent that the house should not be occupied at all, on the day referred to, John Armstrong, one of the original trustees to whom the lot had been conveyed, and holding also other official stations in the collective Church at Maysville, and being the representative of one of the contending parties, had the house fastened up; but other and more numerous officers and trustees of the other party, had the doors opened, and occupied the Church, with their preachers.

Case stated.

In this state of things, John Armstrong, in behalf of himself and others acting with him, filed this bill, complaining in effect of a forcible expulsion from the house, claiming that he and his associates, as members of the Methodist Episcopal Church, in the United States, were, together with their preacher, entitled by the terms of the deed under which the lot was held, and the building erected, to the free and undisturbed use of the house, but that the opposite party having renounced the authority of

The complaint in the bill of Armstrong, of expulsion from the Church at Maysville, and claiming the exclusive use of the same for the 'Methodist Episcopal Church in the U. States,' in virtue of the deed and as trustee.

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

The defence of the remaining trustees and others to the claims of complainant, denying their exclusive right as claimed, or any right to the use of the Church building, and claiming the exclusive right for their organization under a recommendation and act of the General Conference of the M. E. Church in the U. States in 1844, and the act of the Ky. Conference in 1845, and the Maysville Church, in obedience to said recommendation and insisting that their occupation of the Church was consistent with the deed.

the Methodist Episcopal Church in the United States, and entered into a new and distinct organization, under an independent jurisdiction, known as the Methodist Episcopal Church South, were no longer members of the Methodist Episcopal Church in the United States, and therefore, had no rights under the deed. And he invokes the aid of the Court, for maintaining the objects and provisions of the deed, and securing to himself and associates the exclusive use of the Church at Maysville.

The defendents, consisting principally of the four remaining trustees, and several other officers of the collective Church, not only deny the exclusive claim set up in the bill, but deny to the complainant and his associates, as an organized body or congregation, all right to the use of the Church building at Maysville, and claim the exclusive right for themselves and associates; alleging, that at an unusually large meeting of the Methodist Episcopal congregation at Maysville, held after due notice, under the authority of the General Conference of the Methodist Episcopal Church of the United States, and in pursuance of the recommendation of the Bishops of the Church, a clear majority of the members present, voted for adhering to the Methodist Episcopal Church South, which had been organized under the authority of said General Conference, whereby, and by the ascertained concurrence of so many of the absent members, as made, with the said majority of those present, a clear majority of all the members of said congregation or society, the Maysville society was, by the terms of the resolutions passed by the General Conference of 1844, and under their authority, lawfully placed in connection with the Methodist Episcopal Church South. They claim, therefore, that they as members of the Maysville society or Church, with their preacher, authorized by the Kentucky Annual Conference, with which the Maysville society had long been connected, are entitled to the uses provided in the deed, and that the minority having separated themselves from that society, and formed an independent Church or congregation, in opposition to the authority of the Kentucky Annual Conference, and without the sanction and in violation of the resolutions of the General Conference of the entire

Church, their claim to the house was contrary to the provisions of the deed, and to the rules and discipline therein referred to; and that their preacher sent from the Ohio Annual Conference, had no right under the deed and the rules and discipline, to the use of the pulpit in the Church at Maysville, which, according to the pre-existing organization, belonged to the Kentucky Conference, and should receive its preacher from that source, and not from the Ohio Conference, unless under the resolutions of the General Conference, the Maysville society had, by the vote of a majority, beeen detached from the Kentucky Conference.

The complainant also claims the majority to be with his party; but he and his associates rely mainly on the ground already stated, and which is elaborately urged in an able argumentative replication, in which they insist on their continued membership in the same Methodist Episcopal Church in the United States, into which they first entered, and to whose members the use of the property was secured by the deed, and charge that the other party having united itself with a different Church, its members do not come within the description of the beneficiaries in the deed, as members of the Methodist Episcopal Church in the United States. They also deny that the General Conference of 1844, had power to divide the Methodist Episcopal Church, or to dispose of the property secured to its members in the use of their preaching houses, or to dispose of the members themselves by attaching them, against their will, to the anticipated southern organization, or to sanction a division of the Church in its membership, property, or authority. And they further maintain that if the resolutions of that body passed for that purpose, and relied on by the defendants, be valid and binding on the Church, the terms and conditions therein prescribed, have not been complied with so as to legalize the action and independent organization of the Southern Conference, or to afford protection or secure rights to that organization.

Notwithstanding the exclusive right thus asserted and insisted on by each party, the Circuit Court being of opinion that as this was a case of schism or division, not

61*

Gibson et al.
vs
Armstrong, &c.

Complainants deny in their replication that the majority of the Church at Maysville is with the defts., and insist that the defts. have separated from the M. E. Church, and are no longer the beneficiaries entitled under the deed—deny the authority of the General Conference to divide the M. E. Church or dispose of the property secured to the Church in houses of worship, or to dispose of the members against their will to a Southern organization; and that the recommendation of Conference, if legal, has not been complied with.

The decree of the Circuit Court dividing the use of the Church un-

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

der the statute
of 1814. (*Stat.
Law,* 1347.)
caused by immorality, the first proviso in the act of
1814, "for the benefit of religious societies." (2 *Stat.
Law,* 1347,) prescribed the rule of apportionment ac-
cording to numbers, and finding the parties to be nearly
equal in numbers, decreed the alternate use of the house
for one week at a time, to each party in succession.
From this decree each party has appealed, each claiming,
in this as in the Circuit Court, that under the true con-
struction and application of the deed, the exclusive use
is secured to itself, and that the statute prescribed no rule
for the case.

I. We shall first consider the question as to the appli-
cation and effect of the proviso. Conceding that the
body of the statute applies not only to such religious
congregations or societies as are completely independent,
but also to such as may be under relations of dependence
and connection as parts of a larger system, and that when-
ever a lot has been conveyed to trustees for the benefit of
a congregation or society of either sort, for the purposes
mentioned, the succeeding trustees, regularly chosen and
having their names recorded in the County Court, are by
the statute, invested with the legal title and with the pow-
ers expressly enumerated, subject to the proviso; still the
proviso declares nothing more than that the act shall not
be construed to authorize the said trustees, in case of
schism or division, not caused by immorality, to prevent
either of the parties from using the house erected on the
lot, for devotion, a part of the time, proportioned to the
numbers of each; and we are satisfied that it was not in-
tended to control the operation of the deed, or to affect
permanently, the rights of the beneficiaries, or to restrict
the powers of a Court of equity in ascertaining and en-
forcing those rights according to the true intent of the
deed by which they were conferred. The manifest ob-
ject of the statute is to uphold the uses declared in the
deed, by enabling the society to effect in an easy mode,
the transmission of the title from the original trustees to
others chosen as occasion may require. It cannot be sup-
posed that as a consideration for this privilege, the Legis-
lature intended to assume, in case of schism, the abso-
lute disposal of the use itself, by the establishment of a

The proviso
in the statute of
1814 was not in-
tended to control
the operation of
deeds or affect
permanently the
rights of benefi-
ciaries in deeds
for Church prop-
erty, or restrict
the powers of
Courts of equity
in ascertaining
and enforcing the
rights according
to the true intent
of the deeds con-
ferring the rights.

rule which might, in many instances, defeat the obvious intent of the deed.   The proviso does not imply such an interference with the trust; and to give to it such an effect by construction, would be carrying it not only beyond its literal import, but beyond any reasonable motive for its enactment, and perhaps beyond the competency of the legislative power.   As the statute not only invests the trustees chosen under its provisions with the legal title, but also empowers them to do any act "which may be necessary for the use aforesaid," it seems to have been a necessary precaution to prohibit them in cases of a division, in which they might be identified with one of the parties, or might be otherwise incompetent to determine the right, from preventing, by their own action, either party from occupying the premises for devotion.   So far as the trustees were authorized to act, they were to regard both parties as being entitled to the use, and as in such a case the rule of apportionment according to numbers, is obviously just, the trustees were prohibited from using their authority under the statute, to prevent either party from a proportional use.

This is, in our opinion, the true extent and operation of the proviso under consideration.   It prohibits the trustees in cases of division referred to, from shutting the door at their own discretion against either party.   It prohibits them probably from expelling either party by an action at law, in which the legal title might prevail without regard to the equities of the case.   It may perhaps prohibit them as mere holders of the legal title, and of the powers vested by the statute, and not being beneficiaries, from obtaining relief even in a Court of equity, in favor of one of the parties to the exclusion of the other.   But it does not prohibit the persons claiming as beneficiaries under the deed, from appealing to that Court for the establishment of their right against opposing claimants under the deed.   Nor does it prohibit the Court, in a case properly before it, from deciding the right, as it is bound to do, according to its opinion of the true construction and operation of the deed under which it is derived.   In such a contest, the trustees as holders of the legal title, need not be complainants.   It is sufficient that they be

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

—The proviso was intended to prevent the trustees in cases of schism, from excluding either party from the Church, or perhaps from expelling them, even by an action at law; but it does not prohibit the application of either party, being beneficiaries, from an application to the Chancellor for the establishment of their right against other claimants under the deed, which they are bound to do. The trustees are sufficiently before the Court by being defendants to the suit between those claiming as beneficiaries under the deed.

Gibson et al.
vs
Armstrong, &c.

Curd vs Wallace, (7 Dana.)

made defendants. The Court, with the legal title and the adverse claimants before it, can perform its office fully, and secure the appropriate relief without the aid or action of the trustees. Whatever, therefore, may be the extent of the restriction imposed by the proviso upon the exercise by the trustees of the rights or powers conferred on them by the statute, it does not prescribe any peremptory or universal rule for determining a contest between contending parties claiming the benefit of the deed.

Shannon vs Frost (3 B. Monroe, 253,) cited and approved.

. The foregoing views are in substantial accordance with the construction given to the proviso in the case of *Curd* vs *Wallace*, (7 *Dana*, 190,) in which it is said the proviso gives no right to either party which did not otherwise exist. And although in that case the rule of apportionment was adopted, this seems to have been done upon the assumption that the suit could only be sustained under the authority conferred by the statute, whence it was concluded that the relief obtained should be subject to the restriction of the proviso. But under the authority of the subsequent case of *Shannon* vs *Frost*, (3 *B. Monroe*, 253,) this assumption must be regarded as entirely overruled, or as being restricted to the particular circumstances existing in the case of *Curd* vs *Wallace*.

A construction given to the statute of 1835, (3 St. Law, 499.)

In the case of *Shannon* vs *Frost*, the Court following, as we think, the precedents and practice of a Court of equity, granted relief upon a bill filed by a committee sueing in behalf of a congregation, to protect it from disturbance by expelled or schismatic members, and the trustees were made defendants. Then an act of 1835, (3 *Stat. Law*, 499,) authorizes any religious society to appoint a committee or trustees upon its own record book, and without conferring on them the legal title or imposing any restriction, authorizes them to enforce by suit, any claim of the society to property, and to recover for damages done to it, &c. It is obvious that a religious society may obtain, by proceeding under this statute, substantially. the same advantages for the protection of their property, as by proceeding under the act of 1814. And looking to both of the statutes and to the two cases which have been referred to, we conclude that no substantial right is lost or gained to the beneficiaries by proceeding

under one instead of the other. And that in all cases of this character, the real question is, whether the deed when applied to the facts, furnishes a sufficient and safe basis for judicial discrimination between the parties.

In the case before us, the bill, as already stated, was filed by one of the original trustees, sueing for himself and his associates. The case is therefore not directly within the authority of *Curd* vs *Wallace*, where the trustees deriving authority from the act of 1814, were complainants. Two other persons named as trustees in the deed, who with the complainant, are the only survivors, are made defendants. The trustees appointed by the undivided society, and by each party since the division, are also defendants, so that the legal title in whomsoever it may be, is before the Court. The appointment of all of these trustees, except those named in the deed, has been made since the passage of the act of 1845. But although we suppose the legal title to have passed to such of them as were appointed by the proper authority, and had their appointments recorded in the County Court, the proviso in the act of 1814, has, in our opinion, no operation on the case, unless under the deed each of the parties, or one as much as the other, is entitled to partipate in the use. No question is made as to the competency of the parties to represent the claimants on either side, and we regard the case as fairly presented for decision on the merits of the respective claims under all the considerations which should bear upon the question in a Court of equity.

II. We proceed, therefore, to the inquiry, whether under a proper construction of the deed, as applied to the existing state of things in the divided Church, each of these parties is entitled to participate in the use of the property in question, or whether one alone, and if so, which one is entitled to the use in exclusion of the other. The consideration urged upon us, that this inquiry involves not merely the title or use of the Maysville Church building, as contested in the present case, but also the title to a large amount of other property within the limits of the Southern organization, referred to in the pleadings, gives to the present investigation and decision, an

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

The bill being filed by one of the original trustees named in the deed for the Church properly on behalf of himself and his associates, and others of the trustees, claiming to be beneficiaries, being defendants, the rights of the parties interested are properly before the Court.

The provisions of the deed for the church property, 1st. For a house of worship for the use of the members of the M. E. Church in the U States of America, &c.

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

importance which will justify a more detailed statement of facts and argument, than would otherwise be allowable in a judicial opinion.

The deed under which both parties claim, pursues strictly the form prescribed or recommended for general use in the book of discipline of the Methodist Episcopal Church, as early as 1796. It was executed in 1812, and for the consideration of fifty dollars, paid to the grantor, conveys to five named trustees and their successors forever, a designated lot or parcel of ground in the town (now city) of Maysville, upon the following trusts, (which we number for convenient reference:)

1st. That they will erect or cause to be erected thereon, a house or place of worship for the use of the members of the Methodist Episcopal Church in the United States of America, according to the rules and discipline, which, from time to time, may be agreed on and adopted by the ministers and preachers of said Church, at their General Conferences in the United States of America.

2d. And in further trust and confidence, that they shall, at all times, permit such ministers and preachers belonging to said Church as shall, from time to time, be duly authorized by the General Conference of the ministers and preachers of said Methodist Episcopal Church, or by the Annual Conference authorized by the said General Conference, to preach and expound the holy word of God therein.

3d. And in further trust and confidence, that when one or more of said trustees shall die, or cease to be a member of said Church, according to the rules and discipline, then it shall be the duty of the stationed minister or preacher, (authorized as aforesaid,) who shall have the pastoral charge of the members of the said Church, to call a meeting of the remaining trustees, &c. &c.; and the vacancy is to be supplied by choosing in the designated mode, one or more persons, who shall have been a member or members of said Church for one year.

4th. Provided, that in case the trustees or any of them, shall be bound for any sum of money on account of said premises, and obliged to pay the same, they are authorized to raise it by mortgage or sale of the premises, after

notice given to the pastor or preacher who has the over-
sight of the congregation attending divine service on the
said premises; and any surplus arising from such sale, is
directed to be placed in the hands of the Stewart of the
society belonging to or attending divine service on said
premises, to be disposed of by the next Annual Confer-
ence, according to its best judgment, for the use of said
society.

The two first clauses have been copied literally, and of
the two others, of which the substance is stated, such ex-
pressions are retained as are supposed to be in any degree
illustrative of the previous portions and of the intended
operation of the entire instrument.

In reference to a question arising incidentally in the
case, we remark that the phrase, "the said Church," used
three times in the third clause, evidently means, in the
second instance of its use therein, the local Church or
congregation worshiping on the premises, of whose mem-
bers alone the stationed preacher has the pastoral charge;
and we think the same meaning should be given to the
same words in the first and third instances of their use in
the same clause. From this construction it follows that
a trustee might be regarded as vacating his office by ceas-
ing to be a member of the local Church, of which he was
a trustee, and that his place might be filled according to
the third clause of the deed, although he took member-
ship in the local Church of some other place, and in that
way continued to be a member of the Methodist Episco-
pal Church.

It should be stated as essential to a proper understand-
ing of the deed, and to a correct application of its terms
to persons and things, that the funds for purchasing the
lot and erecting the buildings thereon, were furnished in
the first instance, by the Methodists residing in and near
Maysville, and by some few others for their use, and that
such as have been since found necessary, have been fur-
nished, probably by the members of the congregation
which attended divine service on the premises.

1. The first proposition which we deduce from the deed
and the facts connected with its execution, is that the
grantor was not the donor of a charity, but the vendor of

*Marginalia:*

GIBSON et al.
vs
ARMSTRONG, &c.

The terms "the said Church," used in the second clause of the deed, evidently means the local Church worshiping at Maysville. And a trustee would loose his powers as such, by ceasing to be a member of the local Church of which he was a trustee, although a member of the M. E. Church located elsewhere.

The grantor in the deed for Church property, was not the donor of a charity;

GIBSON *et al.* vs ARMSTRONG, &c.

*but the vendor of land for a consideration paid, and therefore the estate can never revert, tho' the M. E. Church should cease to exist; but the use belongs to the local society worshiping at that place, unless forfeited by a departure from the conditions of the deed.*

land in fee, for a consideration paid, and that consequently, there never can be a reverter of the estate to him or his heirs, though the uses should wholly fail, and the Methodist Episcopal Church be utterly subverted and extinguished. The last clause of the deed shows that upon a sale of the premises, though involving perhaps their total alienation from the uses declared, the surplus is to be disposed of, not for the purpose of reimbursing the donations made, nor for the direct benefit of any individuals, but for the use of the local society belonging to or attending divine service on the premises. Whence it may be inferred that so long as that local society remains and can be identified, the uses of the deed will not fail, but will still pertain to that society, unless forfeited by its departure from the conditions of the deed.

2. A second proposition arising from the very nature and circumstances of the case, and demonstrated by the features of the deed and other considerations just referred to, is that notwithstanding the apparent comprehensiveness of the terms in which the use is declared in favor of the members of the Methodist Episcopal Church in the United States, the actual use, that is, the use of the premises by occupancy and for accommodation, and the immediate control of them as a place of worship, was intended to be secured to the local congregation or society subject to the rules and regulations prescribed by the higher authorities of the Church. The primary object of the whole transaction must necessarily have been to provide and secure a place of worship according to the Methodist Episcopal discipline, for the local society, (of that denomination,) by and for which the contributions were made, and which was expected to attend worship on the premises. It is to such society and its members alone, that the first clause of the deed secures any proprietary right or any tangible interest which can be the subject of adjudication by the civil tribunals. The members of the Methodist Episcopal Church at large, not belonging to the local society, can, in a general view, have no other use of the local premises but through the instrumentality of the local society, and by means of the subordination of the local use to the laws and authority of the

*The import of the deed is, that the use and occupancy of the Church is to be for the accommodation of the local congregation or society at Maysville, tho' subject to the rules and regulations prescribed by the higher authorities of the M. E. Church— Members of the M. E. Church at large can have no other use of the local premises; but through the instrumentality of the local society, and in subordination to the Church at large.*

Church at large. This use is doubtless within the provi-
sions of the deed, and cannot be disregarded by the
Court, but it is to be maintained not as an independent
right, but only by maintaining the use in the local socie-
ty, according to the laws of the Church.  Any right of
temporary participation in this local use which courtesy
or usage, or even the rules and discipline may allow to a
visiting member from a different local society of the same
denomination or general Church, can scarcely be regard-
ed as forming an exception to the general proposition
which we have asserted.  We perceive no ground on which
the civil tribunal could interpose for the enforcement of
such a right against the local society.  Although the trust
is declared to be for the use of the members of the Meth-
odist Episcopal Church in the United States, whence it
might be inferred that membership of the general organi-
zation of that Church, alone gives the right, yet that mem-
bership is itself acquired only by a membership in some
local society connected with the general organization and
forming a part of it.  It is, in fact, the local society wor-
shiping at the place, that is entitled to the use, and indi-
viduals are entitled only as members of, and in subordina-
tion to the society, to which in its organized form and in
subjection to the rules and discipline and general legisla-
tion of the Church of which itself is a part, belong the
immediate use and control of the local premises.  Any
dispute between individuals and the society in regard to
the fact of membership, or the rights pertaining to that
relation, must present an ecclesiastical question, of which
the decision by the tribunals of the Church would, in
general, be regarded as final by the civil power.

3. In case of a division of the local society into two
organized parts, though the individuals of each party
might still answer to the general description of the bene-
ficiaries as contained in the deed, it does not follow that
each party would be entitled to the use of the house of
worship.  For the members of each distinct society of
the same denomination might come equally within the
general description, and most obviously no one of these
societies could, upon that ground, claim to oust any other
from the use of its own house of worship.  But as under

GIBSON et al.
vs
ARMSTRONG, &c.

In case of a di-
vision of the lo-
cal society, each
claiming the use,
their rights must
be decided by
rules of the
Church, in which
no right is per-
ceived in a sep-
arating minority
to claim the use
against the ma-
jority maintain-
ing the original
organization.

the propositions which have been advanced, the use belongs, in subordination to the rules and discipline, to the local society, and to individuals as members of it, the title to the use, so far as it depends on this first clause of the deed, must, in case of a divided society; be determined by the question which of the two contending bodies is entitled, according to the rules and discipline, and the laws of the Church which they authorize, to be regarded as the true society or as a continuation of the society by which and for whose use the lot was purchased and the building erected and held. We do not say that there could be no case of the friendly and authorized division of a local society, when each party being recognized by the other and by the higher authorities of the Church, might by mutual agreement or otherwise, be entitled to participate in the use which had belonged to the entire society. But with such knowledge of the rules and discipline and laws of the Methodist Episcopal Church as our investigation of the present case has brought to us, we feel authorized to say that next to the diffusion of christian faith and morals, they have in view the preservation of union, and harmony, and order and subordination throughout every part of the great association for whose government they were intended. And we discover in them no sanction for the idea that a minority of one of the societies of the Church separating itself from the major or organized portion, and assuming, at its own mere will, a new and independent organization, can in its corporate form, claim any right of occupying their former house of worship, against the will of the remaining body, which retaining the original organization with the same officers and head or their regularly appointed successors, and preserving the same position in the general organization, has in point of fact, and in view of the law, these satisfactory evidences of its being the true society entitled to the use. Certainly the separating portion could not, by its own mere will, nor by assuming an internal organization conforming to the rules and discipline and usages of the Church, nor by placing over itself a preacher of its own choice, nor by claiming to be the true and only society of the Methodist Episcopal Church belong-

ing to the place, become *ipso facto* an organized portion of the general body or Church. Until recognized by the proper authority of the Church and taken into the connection according to its laws, it would stand as an isolated body, unconnected with the general organization and independent of it. Whether during the continuance of this condition, the members of such separating portion might be entitled to any civil rights pertaining to members of the general organization or Church, we need not enquire. However this might be, or whatever might be the case if an entire local society were to assume an attitude of independence and continued in the enjoyment of the local property without a rival claimant; we are satisfied that it would be in direct violation of that principle of the deed which subjects the use of the house of worship to the rules and discipline of the Church, to lend the coercive power of the law for establishing in an independent and unrecognized portion of the local society, a distinct right of occupancy impinging in any degree upon the full and exclusive use of the house by the other, and especially the major portion, claiming the use under its original form and relations, maintaining, so far as its own action was concerned, its connections and dependence as before, and recognized by the proper authorities as a legitimate part of the larger organization.

4. The second clause in the deed points out more explicitly than the first, the position in the general organization of the local society to which the use is intended to be secured, and establishes clearly one criterion of right which is included in the first clause only by reference to the rules of discipline. The second clause relates to the use of the pulpit, and secures it at all times to such ministers and preachers belonging to the Methodist Episcopal Church, as shall be authorized by the General Conference, or by the Annual Conference authorized by said General Conference, to preach and expound the holy word of God therein. It is not necessary to go into any discussion of the official character and duties of the preacher, nor of his connection with the use of the house by the members, nor of his relation to them or to the society of which, in the language of the deed in a subse-

The deed secures the use of the pulpit to such ministers belonging to the M. E. Church as shall be designated by the General Conference, or the Annual Conferences under the authority of the General Conference, and to none other.

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

quent clause, he has the pastoral charge and oversight. It is palpable that the preacher to whose use the pulpit is secured, is to be the preacher of the society to whose use for worship the body of the house is secured, that he is to expound the word of God to the members of that society, and in all respects to perform the duties and exercise the privileges of their preacher and head in the Church.

It would be an absurdity to suppose that the use of the body of the house was intended to be secured to any society, whether its members claimed to be of the Methodist Episcopal Church or not, which would not receive the preacher to whom alone the use of the pulpit was secured. It is just as certain then, in case of division, that the exclusive use is secured to that portion of the society which receives the preacher authorized as mentioned in this clause, as it is that the use is secured to no other preacher but such as is thus authorized. This is the great point of external union with the general organization, which fixes the dependence and subordination of the local societies. It is moreover the especial means of securing the great principle of an itinerant ministry which characterizes this Church, and is regarded as the chief instrument of its success. So far, then, as the deed framed for general use in securing the preaching houses of the Church, is to be viewed as a means of perpetuating its peculiar organization and policy, the principle that the use of the houses is secured to those preachers only who are regularly authorized to preach therein, and to the local societies receiving such preachers, must be regarded as of paramount importance, and as giving proportional weight to the test of right which it furnishes.

5. The appointment by the proper authority, of a preacher for one of the portions of a divided society and its reception of the preacher thus appointed, constitute a mutual recognition, which being found to exist in favor of one portion and not of the other, must, unless in some most *extraordinary case*, go far to satisfy the mind of the Judge, that the party thus recognizing and recogized by the proper authority, stands legitimately and properly in the place of the entire original society, and is cloathed with its rights. And if the authority thus re-

In case of division in the local society, the branch of the divided church receiving the minister from the appointing authority, recognized by the society, is to be recognized as the organization entitled to the use of the pulpit under the deed.

cognizing and recognized by one of the parties, be the accustomed authority, having by the general laws and usages of the Church jurisdiction over the entire original society, this circumstance will furnish a strong and *prima facie*, a satisfactory proof of right, throwing upon the other party the burthen of showing clearly that the accustomed jurisdiction had ceased to be legitimate, and had been properly displaced by another, which being possessed of the true authority, and recognizing this last party and being recognized by it, had conferred upon it the evidences of right as the representative of the original society. It is not enough for a party contending against the accustomed authority and the accustomed evidences of right, to found its claim upon a doubtful question, whether that organ of the association usually exercising, the jurisdiction in question may not have lost it by some act of its own in violation of the laws of the Church. It is for the authorities of the Church, in the first instance, to judge of an infraction of its laws, and to determine whether the ecclesiastical jurisdiction belonging to any particular body or functionary of the association had been forfeited by such infraction. The civil Judge might greatly apprehend that he would be transcending his proper sphere, if he were to interpose in the first instance to determine such a question, and to enforce his judgment upon it. He would at least lend a reluctant ear to a claim founded on the alledged invalidity, in view of the law of the Church, of an act done in the accustomed manner by the accustomed organ of authority, and sanctioned or acquiesced in by all other recognized organs of the Church. The party setting up a claim on the ground of such alledged illegality, should at least plant itself opon some opposing act or judgment of some recognized organ or body in the Church having authority to act or to judge in the premises. At any rate, if a minority of the local society can, on the ground of a strict right, and of its own determination to resist an alledged infraction of the laws and organization of the Church, claim the intervention of the civil power against the majority having in its favor the accustomed evidences of right, it must bring itself and its claim clearly and

GIBSON *et al.*
*vs*
ARMSTRONG, &C.

If this is controverted, the party denying is bound to make out their right clearly and conclusively.

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

conclusively within the right as indicated by the terms of the deed, and by the rules and discipline to which it refers. And this it can scarcely do, when it acts not only in opposition to the accustomed local authority, but also in defiance of the highest tribunals of the Church.

6. If there is any truth in the positions which have been advanced, they establish the principal, that in case of a division purely local, in one of the societies for whose use for worship the local property is conveyed and held, the proprietary right is in that party which maintains the true position of subordination and connection, which according to the rules and discipline and authoritative action of the Church, properly belongs to the entire society, and not to that party which claiming in opposition to the authoritative action of the Church, places itself in an unlawful position, and would, in its enjoyment of the use, defeat that provision of the deed which, by subjecting the use to the rules and discipline, subjects it to the legislation which they authorize. Where the local division relates to and is founded on a more general division of the Church, and arises from the adherence of the different local parties to different bodies into which the general Church may have been divided, the question of right between the local parties may involve an inquiry into the circumstances and legality of the larger division, and into the rights of the larger bodies to which the local parties may respectively adhere, But the object of the deed, so long as it maintains the use, is still to maintain it in subordination to the proper authority and to secure it to the society acknowledging that authority and holding in subordination to it. In this more complicated state of case, therefore, as in the more simple one of a purely local division, the question is, what according to the rules and discipline and laws of the Church, is the true position of the local society, and which of the contending parties occupies that position? If it be satisfactorily ascertained that one of the parties alone maintains the lawful position and relations pertaining to the local society to which the use is secured by the deed, the conclusion must be that the entire right is in that party. The two parties avowing adherence to different organizations and

professing obedience to different jurisdictions, could not both be entitled to the use, unless each of the larger bodies to which they adhered, be entitled to the jurisdiction; and it is difficult to suppose that any circumstance in the deed could withhold the use from that party which alone would hold it under the proper jurisdiction. The preliminary statement of the pleadings and claims of the parties, shows the general bearings of the foregoing views, upon the case before us. It is necessary, however, to their more direct application, and to the more precise developement of the question to be decided, that we should advert to some of the prominent facts out of which the contest has grown. The notoriety of many of them will render a detail unnecessary.

III. It appears that by the constitution of the Methodist Episcopal Church, as existing previously to the late dismemberment, the General Conference consisted of delegates chosen by the several Annual Conferences extending through the United States and Texas; that by the rules and discipline it had power, under a few specific restrictions, to legislate for the entire Church embraced in this extensive organization; that it regulated the boundaries and interior organization of the several Annual Conferences, and that for many years prior to the separation, the Annual Conference of Kentucky embraced the whole State, except the part west of the Tennessee river; that the bodies or meetings called Annual Conferences, by which alone the delegates to the General Conference are chosen, consist of the ministers and travelling preachers within the boundaries of the respective Conferences, from whom are supplied, under the authority of the General Conference, and by express provision of the rules and discipline, the preachers for the several stations, societies, &c., within the bounds of the Conference. The Maysville station or society being embraced within the Kentucky Conference, rightfully and habitually received its preacher from that Conference prior to the division.

But the General Conference of 1844, having adopted measures which, by many southern delegates, were deemed injurious to the rights, and character, and usefulness of the southern ministry of the Methodist Episcopal

*(margin:)* Gibson *et al.* vs Armstrong, &c.

*(margin:)* The organization of the M. Episcopal church in the U. S. previously to, and at the date of the deed in this case.

*(margin:)* The resolutions of the General Conference of 1844, upon the subject of the division of the

'GIBSON *et al.*
*vs*
ARMSTRONG, &c.

Church,' and authorizing the Southern organization.

The action of the Southern Conferences in joint assembly in '45, under the resolutions of the General Conference of 1844, renouncing connection with the pre existing organization, and organizing under the name of the "M. E. Church South," but retaining the same *faith, doctrine, rules and discipline*—ratified by the Kentucky & other Annual Conferences.

The Maysville local church divide, one receiving a preacher from the Northern and the other from the Southern organization, each claim the exclusive use of the church property in contest.

Church, a declaration signed by the southern delegates, and stating their apprehension of the necessity of a separation, was presented to the General Conference, which thereupon passed a set of resolutions providing for the manner and consequences of the anticipated separation, should it be found necessary, and authorizing, in that event, a distinct southern organization.

Under the sanction of these resolutions, a convention of delegates from fifteen southern Conferences, assembled in 1845, renounced, by solemn act, their connection with the pre-existing organization and the jurisdiction of the General Conference as then constituted, and retaining the same faith and doctrine, the same rules and discipline and the same form of constitution and government, established for themselves a new and independent organization, under the name of "the Methodist Episcopal Church South," and a new General Conference for that Church. The Kentucky Annual Conference, with the others represented in the Convention, ratified this act, and thus became connected with the southern organization, and a component part of the Methodist Episcopal Church South.

One portion of the Maysville society adhering to the Methodist Episcopal Church South, and acknowledging its jurisdiction, receives its preacher as usual, from the Kentucky Conference, the other portion rejecting the new organization, professes adherence to so much as remains of the old one, under the name of "the Methodist Episcopal Church," and receives its preacher, as is understood, from the neighboring Conference of Ohio. We have seen, however, that the members of this society or party claim that they being still members of the Methodist Episcopal Church, and the others being members of a different Church, they alone, as coming within the description of beneficiaries in the deed, and acknowledging the jurisdiction of the General Conference therein referred to, are entitled to the exclusive use of the property.

IV. In considering this claim, which merging the question as to the lawfulness of the southern organization, the division of jurisdiction between the two general Churches, and the true position of the Maysville Church or society,

as pertaining to one or the other jurisdiction, rests solely upon a strict literal application of the terms of the deed to the members of the Methodist Episcopal Church, and the General Conference of that Church, we shall not stop to determine whether the party setting up this claim, has shown such a subsisting connection, (since the division,) between itself and that organization, which it claims to be the only true Methodist Episcopal Church in the United States, as would, under the interpretation contended for, entitle its members to any right of property on the ground of their being members of the Methodist Episcopal Church. But assuming for the present, that there is such connection, and on the other hand, that the separation of the southern Conferences, and the independant organization of the Methodist Episcopal Church South, took place under the authoritative sanction of the original Methodist Episcopal Church, and that the Maysville society was lawfully placed under the jurisdiction of the southern Church, we inquire whether, by force of the terms of the deed used in describing the beneficiaries and the use of the property, that portion of the Maysville society which maintains the lawful position of that society, is to be excluded, to any extent, from the use, in favor of that portion which, in violation of the terms of separation, would place it in an unlawful position? A summary answer to this question may be suggested by the supposition that instead of the Maysville society being divided upon the question of jurisdiction, it had adhered, unanimously, to the Kentucky Conference, and gone with it into the southern organization. Would the entire society have lost by this authorized movement, its right to the use of the local property? Could it have been afterwards disturbed in its use by any action of the remaining Methodist Episcopal Church or its General Conference, either by a preacher sent in opposition to the authority of the southern Church, or by a new society reared up in the city of Maysville, under the care of the other Church? If, as we suppose must be admitted, it could not, how can the right of the major portion of the society occupying the lawful position of the whole, be denied, or how

can it be affected by the claim of the minority, not occupying the lawful position of the whole society?

But we do not rest the negation of a claim so strenuously urged as this has been, both by the party and the counsel, upon the force of these interrogatories. In the first place, we do not admit that the phrases, "the members of the Methodist Episcopal Church" and "the ministers and preachers," and "General Conference of said Church," used in the deed as descriptive of the beneficiaries, and of the power or organ of the Church by which the use may be regulated, can operate to make the continuance of the name and unity and organization of the Church in the precise state in which they are referred to in the deed, or existing at its date, a condition on which the continuance of the use or right of occupancy is to depend. This deed, and the others like it, were not executed by a donor, prescribing as the condition of his charity, that it should be administered through all time, in a designated mode, and through a special instrumentality created by himself. They do not create the institution which is to receive the charity, nor profess to regulate its constitution. The donations were made by the persons who were themselves to enjoy the use as members of an existing association, and it cannot be inferred from a mere reference in the deed to the existing name and organization of the body, and to the functions of its parts as then exercised, that it was intended to preclude absolutely, such changes by the proper authority, in any or all of these particulars, as necessity or convenience, or a sense of propriety might dictate, or that it was intended that the rights of the actual donors or their successors, assured by the deed, should be forfeited by yielding to such change.

The Methodist Episcopal Church as an organized body, instituted and maintained by the voluntary association of individuals, existed and still exists, independently of the deeds, and with the same power of changing its name and form and organization, as it had at first of fixing them. This power, inherent and inextinguishable in the Church, the deed, by whomsoever made, and although the grantor might be a donor, could not annihilate; and without ex-

press words to that effect, it cannot be presumed that they intended to control or limit its exercise. They could not, and do not profess to give perpetuity to the institutions to which they refer, and they should not be understood as making their immutability a condition of the enjoyment which they profess to secure. It is to be observed too, that it is not the deed but the constitution of the Church, the terms of association, the rules and discipline that subject the local societies to the authority and legislation of the Church. The deeds, in placing according to their appropriate operation, the use of the local property under the same subjection, intend not to impair but to secure the relations of authority and subordination which the rules and discipline establish. And it would involve an obvious inconsistency to say, that by obedience to the authoritative legislation of the Church, no matter what changes it might involve, a local society would forfeit its right to the use which by the deed creating it, is subjected to the same legislation. Such a consequence from such a cause, would be the more unjust, inasmuch as by the general laws of the Church, the local societies have no voice in the legislation which they are bound to obey. It seems more consonant with reason and with the general objects of the deeds, to say that in subjecting the use to the same authority to which the beneficiaries are subjected, they intend to make disobedience rather than obedience to the lawful acts of the Church, a ground for forfeiture, and that although the use is conveyed to the local societies, as parts or sections of one general body by name, yet so long as they remain blameless, their right to the use cannot be affected by any change in the name, condition or organization of the general Church, whether caused by its own will or by a necessity beyond its control. And we embrace the conclusion that whatever change, by its own legislation or by inevitable calamity, might befall the Church, though its entire connecting organization should be dissolved, the Episcopate be lost, the General Conference become extinct, and nothing remain but the Annual Conferences with their interior organization, or nothing but the local societies themselves, and though in this state of things there

society under any particular name; and the right of the local society under the deed, would not, though the General Conference should cease to meet, become extinct.

GIBSON *et al.*
*vs*
ARMSTRONG, &C.

The great object of the deed in the case, was to secure the use to the local Church, though in subordination to the higher authorities of the church as then existing. It does not now exist as it then did, but the local society, the beneficiaries, are there, and the deed should not fail to secure the benefits extended to the local society.

would, in strictness, be no Methodist Episcopal Church, the use would still remain secured to these societies, under the firm tenure of these deeds.

The first object of the deed, we repeat, was to secure the local use to the local societies. They intended to secure it in subordination to the higher authorities of the Church, whereby the regular connection and relation of the parts to the whole would be secured. And they looked to the existing organization by which the great mass of the Methodist Episcopalians in the United States were constituted one body, as the whole, of which these societies were parts, and to whose laws their use of the local property was to be subject. But this union and organization, powerful and complete as they were, though connected by long cherished sentiments of affection, by the sense of power and by the pride of success, and though sustained by institutions apparently calculated to secure, not only the indefinite extension, but the continued integrity of the body, were still subject to the law of change, and to all the vicissitudes that belong to the creations of men. They were subject to change, not only from the force of external circumstances, over which the body itself might have no control, but more certainly perhaps, from the various and varying will or opinions or interests of its component parts, and at last, inevitably from its own extension, involving unwieldy magnitude. and the union of incoherent elements. The deed, though it may have intended to avert, has been powerless to prevent, and does not profess to prohibit a change of organization by which the union existing when it was executed, and when its provisions were framed, has been dissolved. That union has in fact been broken up by a division of the Church into two distinct parts. And we are called on to apply to the consequences of a catastrophy which, if it had not occurred when and as it did, must at some time have happened, the provisions of a deed which having been made when the Church was united and division not contemplated, refers, as might be expected, to the existing name and organs and action of a united Church. The one united Methodist Episcopal Church referred to in the deed, and extending its name and au-

thority to the utmost limits of the United States, having ceased to exist by division into two Churches, of distinct territorial jurisdiction, there is in fact no such Church as is contemplated in the deed, and therefore no General Conference of such a Church, no ministers and preachers of such a Church, no members of such a Church. Must the uses of the deed then fail by a technical interpretation of its terms, because the objects referred to no longer exist in the same forms and under the same name as when it was framed and executed? Or should we not look to the substance rather than to the names and forms of things? And if in consequence of changes, which if not inevitable, cannot be repaired, every object of the deed cannot be precisely attained, should it not, so far as possible, be made effectual to secure its substantial and primary objects, by a liberal application of its terms to the actual state of things? As the Methodist Episcopal Church in its name and unity as well as in its particular organization was subject to change, as the makers of the deed by which property is conveyed to the use of a particular section of the Church, had no right to control its power of self-regulation, and have not professed nor attempted to do so, and as it would be subversive of the primary objects of the deed, to make its efficacy to uphold the uses which it declares, dependent on the continued identity of the name and functions and organization to which it refers in describing those uses, it seems to be not only reasonable but necessary, that it should receive such a construction as will make it at all times applicable to the condition in which the Church may be placed, either by its own legislation or by a recognized necessity, the force of which legitimates its consequences; that its reference to certain powers and functions as belonging to particular organs existing at its date, should be understood as applying to the same functions by whatever organs they might afterwards be legitimately exercised; and that in subjecting the use to the action of the existing organs of legislation and appointment, it should be understood as intending to subject them to the legitimate successors of those organs. So that in maintaining this sudjection, its objects, so far as in refer-

The right of the M. E. Church to change materially its form of organization was recognized by the act of the church in changing the character of the component parts of the General Conference in 1808.

ring to the exterior relations of the local society, it intends to fix its position as part of a larger system, and to secure its subordination to a higher authority, are fully accomplished.

If the unity of the Church had remained unbroken by the late revolution, there could, as we think, be no serious question as to the correctness of a construction which would make the deed applicable to any changes which the Church might authorize, with the effect of securing the property to the local society preserving its proper relations in obedience to such change, to the exclusion of any organized portion of it, which opposing the change, might refuse obedience to the authority of the Church, and throw off the appropriate relations of the society. In fact, before the execution of this deed, but after its language had been framed and recommended for general use, a most important change had already occurred in the composition and authority of the General Conference. That body, consisting originally, as might be implied from the reference to it in the deed, of all the ministers and preachers of the Methodist Episcopal Church in the United States, in whom collectively subsisted without restriction, the power of legislation and government in the Church, was transformed in the year 1808, by its own action, into an assembly of delegates to be chosen by the ministers and preachers in their several Annual Conferences, and to be possessed of restricted powers. This change was not even followed by an alteration in the terms of the deed referring to the General Conference, and certainly had no effect upon its operation in securing either the local property to the local societies, or the subordination of its use to the legislation of the General Conference as newly organized. Nor can it be doubted, that in case of division and contest in one of the societies, based upon a difference of opinion as to the propriety of this change, or of submission to it, the deed whether executed before or after the change, would have decided peremptorily against the party, which in an organized form, had renounced the authority of the new General Conference, and was renounced by it. And so if after the execution of the deed before us, there had

been a further authoritative change in the composition of the General Conference by the introduction of lay delegates, or if its name had been changed to that of "the General Assembly of the Methodist Episcopal Church," and so if the power of appointing the preachers to their several stations, had been vested exclusively in the Bishops, or if the office of Bishop had been wholly abolished, and a corresponding change had been made in the name of the Church, whereby it had become "the Methodist, or the Reformed Methodist Church," instead of "the Methodist Episcopal Church."

What effect then, in this last case, would be given in the civil tribunal to the appeal of an organized part of one of the local societies, which separating from its own society, renouncing the authority of the Annual Conference to which it belonged, and rejecting the jurisdiction of the existing General Conference and of "the Reformed Methodist Church," should claim the exclusive, or any interest in the local property, on the ground that "the Reformed Methodist Church" was not "the Methodist Episcopal Church;" that a majority of the society and the Annual and General Conferences with which it was connected, having become or adhered to "the Reformed Methodist Church," were no longer parts or members of "the Methodist Episcopal Church," but that the members of the minority alone, rejecting the new name and the new Church, and continuing to be as they had always been, members of the Methodist Episcopal Church, were alone the true beneficiaries of the deed, and as such entitled to the exclusive use of the property conveyed by it? Most assuredly it would be a sufficient and proper answer to such an appeal, to say that the name, and form and organization of the Church, and the arrangement and functions of its different parts and tribunals, were all subject to be changed according to the will and judgment of the Church, uncontrolled either by the deed or the law of the land; that the Methodist Episcopal Church having by its own act, become the Reformed Methodist Church, this latter Church, whether differing in substance or in name only from the former, occupied its place and authority in the system, and must, in ascertaining the ope-

GIBSON *et al.*
*vs*
ARMSTRONG, &c.
ration of the deed, be regarded as the Church therein referred to; that the deed must, therefore, be understood as securing the use to the members and preachers of this substituted Church, and in subordination to its authority; that the members of the Methodist Episcopal Church became, by the authoritative change of its name and organization, members of the new Church, or continued to be members of the old one by its new name, unless they rejected this membership; that the deed applied and secured the use to them in this character; and that the minority, in rejecting their accustomed relations and position in the system, had abandoned the rights of property pertaining to them as a part of the system.

And if, instead of the change just supposed, the Methodist Episcopal Church had, by its own authoritative act, divided itself into two distinct and independent bodies, each perfect in itself, on the plan of the original organization, and assigning to each on its own side of a common boundary, the entire jurisdiction which it had itself possessed within the same limits, had denominated one "the Methodist Episcopal Church North," and the other "the Methodist Episcopal Church South," these two Churches differing from the original and from each other, only in locality and extent, and in the discriminating adjunct to the common name, would each undoubtedly possess within its territorial limits, the entire jurisdiction and authority of the original united Church, and would within those limits, fully represent it, and to all purposes occupy its place. The members of the pre-existing Church would of course, unless they chose to renounce their membership, be members of the Church North or South, according to the locality of themselves or of the societies to which they belonged. Each of these Churches would bear the same relation to the different parts of the system within its jurisdiction, as the original Church had done to similar parts of the original system. And with respect to the construction and application of these deeds, each would be as to the property within its limits "the Methodist Episcopal Church," for the use of whose members and in subordination to whose laws, the property was conveyed and held; and the deeds would receive the same

The right of the M. E. Church by its own act to divide, recognized as an inherent right, and the right to fix the territorial lines, also recognized without changing the rights of the beneficiaries in the deed in this case, and the deed must be presumed to have been made in view of these rights.

construction and application as if the word "North" or "South" had been added to the name of the Church in the deeds themselves.

Such acts as have been supposed, if done by a competent power in the Church, must, until annulled by a similar authority, be binding upon whatever is subject to the legislation of the Church, whether it be the uses of the local property, the relations of the local societies or other organic parts of the system, or the rights of individual members as such. And we maintain and think it has been clearly shown, that as the deed does not and cannot control these acts, it must be understood as intending to follow them, and by adapting itself to every vicissitude to which the Church may be subject, to attain its great object of securing the use of the local property to the local societies in subordination to the legitimate powers that be.

We come then to the case actually existing, in which, according to the assumptions under which we are now considering the subject, the Church, instead of dividing itself into "the Methodist Episcopal Church North," and "the Methodist Episcopal Church South," leaving no residuum under the name simply of "the Methodist Episcopal Church," has sanctioned the independent organization of the Southern Conferences, and under that sanction, the Maysville society or congregation has been placed under the jurisdiction of the Methodist Episcopal Church South. But is there any difference, so far as the rights and jurisdiction of the Southern Church are concerned, between the case as it actually occurred and the supposed case of a division of the original Church into the Methodist Episcopal Church North, and the Methodist Episcopal Church South? Does the fact that there still remains a portion, whether small or large, of the original body under the original name of the whole, invalidate the separation or the rights of the separating portion? Could the remaining portion of the original body, re-assert in the name of the whole, the jurisdiction which had been renounced by the whole, or revoke the assent which the whole body had once given to the independence of the separating portion? Certainly if the

GIBSON et al.
vs
ARMSTRONG, &c.

The right of the Church to divide is recognized, & the right of the members adhering to the branch of the Church within the jurisdiction in which the local Church exists, conforming to the rules and discipline thereof, is recognized under the deed in this case.

64*

whole body had power by its assent and co-operation, to legalize the separation and independence of a part of it-self, the remaining portion of the original body, though re-taining the original name of the whole, would have no power, after such assent had been given and acted on, to undo by its own mere will, what the entire body had au-thorized. Whatever else may be implied from the iden-tity of name, it cannot give to the present Methodist Episcopal Church a jurisdiction which the original Church had alienated.

But it seems to us too evident to require illustration, that the rights and jurisdiction of the Southern Church, and the rights of its members are precisely the same within its own organization, as if the present Methodist Episcopal Church were called the Methodist Episcopal Church North; that if the southern organization has the sanction of the original Church, it can suffer no dispar-agement from having been the separating portion, but its independence and jurisdiction are complete; and that to the extent of its jurisdiction it stands in the place of the Methodist Episcopal Church, and is to be so regarded, as well in giving construction and application to these deeds, as in determining the rights and duties of its members. It follows, upon the principles already established, that if the Maysville society or congregation has been properly placed under the jurisdiction of the Church South, the use of the property conveyed by the deed before us, is also within that jurisdiction, and belongs to the party ad-hering to that Church, which, so far as this deed and the Maysville society are concerned, is "the Methodist Epis-copal Church," for the use of whose local members the property is conveyed and held.

Did the separa-tion take place in the mode re-commended, and is it valid?

V. But every part of the assumption which establishes the legality of the separation and of the position of the Maysville society as a part of the southern organization, is denied by the complainants, and it is necessary to in-vestigate the assumed basis upon which the foregoing conclusion rests. This investigation involves an inquiry first into the power of the Church to authorize its own dis-memberment, and of the General Conference to act for the Church in this respect, and then into the terms of

separation as prescribed by the resolutions of the General
Conference, and into the proceedings which have taken
place under them, so far as to determine whether the
independent organization of the Methodist Episcopal
Church South, has in fact the sanction of the General
Conference and of the original Church, and whether the
Maysville society or Church is, under the same sanction,
a part of the Southern Church.

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

That a Church organization, a self created body, subject
so far as its own constitution and organization are concern-
ed, to no superior will, cannot by its own assent author-
ize and legalize its own dismemberment, is a proposition
contradicted by reason and analogy. That such a meas-
ure is inconsistent with the motives and ends of its in-
stitution, is no more true with regard to such a body, than
with regard to other associations, private or national.
Even in the case of States and Empires, the unauthori-
zed separation of a part, though originally illegal, and
subjecting the separatists to reclamation and punishment
by the remaining government, is legalized by its subse-
quent assent, with the effect of establishing in the sepa-
rating portion, all the rights of independence and self
government. It is this assent alone which puts a final
end to the right of reclamation on the part of the nation
or government from which a portion has separated. And
much more must the previous consent of the whole na-
tion or its government to the future independence of a part,
have the effect of legalizing a separation taking place in
virtue of such assent, and of terminating absolutely, all
right of reclamation. If in the history of nations we
find few instances in which this assent is yielded except
at the end of a struggle, often bloody and protracted, for
independence on the one side, and on the other for re-
subjugation, there are still some examples of a govern-
ment which, becoming sensible of the necessities of a
connected and dependent portion, or perceiving the incon-
gruities of the connection, has laid down beforehand, the
terms of separation and independence, which on being
accepted and acted on by the portion to which they were
addressed, have become a solemn compact, binding as
such, both upon the old and the new State. Among

A Church organ-
ization being a
self created body
may separate or
divide by its own
act, as States &
Empires may di-
vide, and as did
Kentucky and
Virginia, by con-
sent of the au-
thorities, &c,

these examples the separation of Kentucky from Virginia, of which it formed an integral part, is a precise instance of this kind; an instance too, in which although the government of Virginia was representative in character, possessed of delegated powers only, and not expressly vested with the power of dismembering the State; yet the act and assent of that government was deemed sufficient to authorize the proposed action on the part of the people of Kentucky, who desired separation, and to bind the remaining people of Virginia without further evidence of their will. And yet it was true of the government of Virginia, as of all others, that it was instituted to preserve, and not to destroy the State, or to impair its power.

The duty of caring for and promoting the welfare of every part of the body, the duty of self preservation itself, and the corresponding rights essential under various circumstances, to the performance of these duties, indicate the power of authorizing or assenting to a dismemberment, as one necessarily inherent in every association, to be exercised indeed according to the prescriptions of its fundamental law, if there be any on that subject, but unless there be some special provision or prohibition other than that which is implied from the duty of preserving the integrity of the body, to be exercised as convenience and experience prove by the active governing powers of the association. It does not admit of question that such a power belonged to the Methodist Episcopal Church, and that *prima facie* the General Conference the supreme active organ of its government, clothed with powers of legislation almost unlimited, and having alone in case of unlawful secession, the right of recognition or reclamation, might effectually exercise the power in advance. Indeed, the history of the Church shows that many years since, the General Conference, without reference to its constituents, assented to the separation and independence of the Canada Conference, then forming an integral portion of the general organization, and having, or entitled to have its delegates in the General Conference itself. And although there seems to have been some doubt on the question of power, we do not perceive that the grounds of that doubt bring in question the power of

the General Conference, any more than that of the Church GIBSON *et al.*
*vs*
ARMSTRONG, &c. at large, which is unquestionable. The measure, however, was adopted, and no doubt has been since entertained, of the lawful independence of the Canada Conference.

An earlier instance of the exercise of power on this subject by the delegated General Conference, must not be omitted. Societies of Methodists having been organized in the Canadas by preachers of the Methodist Episcopal Church in the United States, and preachers having been also sent into the same regions by the British Methodists, under whose ministrations local societies were also established in the same towns or neighborhoods, the consequence was, that instead of harmonious efforts in extending their common faith and doctrines, there was sometimes exhibited between the parties acting under these different authorities, an unseemly rivalry, degenerating into a mere struggle on each side to strengthen itself at the expense of its competitor. To put an end to a state of things so derogatory to the character of each of the principal parties, and felt by both to be at once injurious to the religion which they professed, and inconsistent with the relations which a community of origin and of faith and doctrine required, a negotiation was set on foot between the General Conference on the one side, and the British Methodists on the other, the result of which was an agreement fixing the boundary line between the two Canadas as the line which should separate their respective jurisdictions. In pursuance of this agreement, the British Methodists surrendered their societies in Upper Canada to the Methodist Episcopal Church in the United States; and the General Conference, without (so far as we have learned) consulting the societies which had been reared under its care in Lower Canada, or their preachers, or the Annual Conferences in the United States with which they had been connected, withdrew their preachers, surrendered the societies to the British Methodists, and dissolved all of their subsisting relations with the Methodist Episcopal Church in the U. S. An Annual Conference having been afterwards established in Upper Canada, in connection with the Methodist Episcopal

The M. E. Church acted upon the same principle in separating Canada, after first fixing a dividing line between the two bodies of Methodists in Canada; of the propriety of the division the several Conferences had the right to judge.

Church in the United States, the General Conference, at its request, dissolved the connection, and as already stated, authorized it to assume independence. If the fact that the Conference of Upper Canada and the societies in Lower Canada were under a foreign political jurisdiction furnished a strong motive for the acts which have been stated, they also furnished a strong proof of the necessity and existence somewhere in the Church, of a power competent to the performance of such acts. But the acts referred to, involving as they do, the power not only of authorizing, but also of coercing dismemberment, would, as precedents, more than cover the power and act now in question. And the performance of those acts by the General Conference upon its own judgment as to the exigency of the case, implies the assertion by that body of its right to exercise a similar power, when in its own judgment it might be necessary and proper. If owing to the peculiar circumstances then existing, these cases are not entitled to the full weight of precedents, establishing the existence of the power in the General Conference, they at least tend strongly to corroborate the position, that that body is the appropriate and recognized organ of its exercise. We should not indeed, expect to find an express delegation of this power, and especially in an association having for one of its great objects its own extension. But as already shown, the power necessarily exists, to be exercised when occasion may require it. The experience even of this association shows that occasions may arise when a diminution of its extent is proper and necessary, and that the General Conference, according to the indications of convenience and analogy, has been allowed both to judge of the necessity, and to adopt the measures which it required. Whatever dangers may be involved in such a power, however momentous the consequences of its exercise may occasionally be, still when we consider the motives which concur in urging the General Conference to maintain the integrity of the body which it governs, and the extreme improbability that it would consent to a diminution of the body, and of its own power and authority, except upon the most urgent occasion, there would seem to be little ground

for apprehending an abuse of the power in its hands. Then the consideration, that as the representative and governing power of the whole association connected with all its parts, overlooking all, sympathizing with all, it is better able than any or all of the local bodies which it represents, to take a just and comprehensive view of the interests and necessities of the whole, and of every part, demonstrates it to be the proper depository of the power of determining when, in view of the general good, the separation of a part may be necessary or allowable. The fact that it is only through the General Conference that the local bodies composing the system can regularly act upon each other, corroborates the same conclusion. And unless it be assumed that the necessity for separation can never be sufficiently demonstrated until it actually takes place and has become irremediable, that it can, therefore, never be legalized *a priori*, that it must always be violent and unlawful, and can never be peaceful and conventional; we think it must be conceded that in the absence of express provision to the contrary, the General Conference has the right, on its own judgment of the necessity of the case, to assent to, and thus to legalize the separation of a part of the Church. Assuming that in the eye of the Church and of its constitution and laws, peace is deemed better than strife, harmony more desirable than discord, and certainty in the rights and duties of its members preferable to confusion, and regarding it as certain, that in case of illegal separation the General Conference might, by its subsequent action clothe it with all the sanction which the Church could give to it, we do not doubt that the same body, unless specially restricted in that particular, may and should, upon its own judgment of the necessity or justice of an anticipated separation, give to it at once the sanction of the Church and of its law, and by regulating its terms and its limits, make it as fruitful of good and as little harmful as the nature of the case will allow.

VI. In this view of its rights and duties, the General Conference of 1844, seems to have acted in adopting the resolutions under which the Southern Conferences have assumed an independent organization. The declaration

GIBSON *et al.*
*vs*
ARMSTRONG, &c.
ding the Methodist E. Church, and permitting the M. E. Church South to form a separate organization, and to adopt the plan.

of the southern delegates above mentioned, having been referred to a large committee, a preamble declaring it to be "the duty of the General Conference to meet the emergency indicated by the declaration, with christian kindness and the strictest equity," and resolutions framed in the spirit of peace and justice, were reported by the committee and adopted by the Conference by a vote approaching unanimity. The first resolution, which distinctly lays down the plan of the separation, and the condition on which it was to take effect, is in the following words:

The resolutions of the General Conference on the subject of a Southern organization.

"1. Resolved, that should the delegates from the Conferences in the slave holding States find it necessary to unite in a distinct ecclesiastical connection, the following rule shall be observed with regard to the northern boundary of such connection: all the societies, stations and Conferences adhering to the Church in the south by a vote of a majority of the members of such societies, stations and Conferences, shall remain under the unmolested pastoral charge of the Southern Church, and the ministers of the Methodist Episcopal Church shall in no wise attempt to organize Churches or societies within the limits of the Church South, nor shall they attempt to exercise any pastoral charge therein, it being understood that the ministry of the south reciprocally observe the same rule in relation to the stations, societies and Conferences adhering, by vote of a majority, to the Methodist Episcopal Church; provided that this rule shall apply only to societies, stations and Conferences on the line of division and not to interior charges, which shall, in all cases, be left to the care of the Church within whose territory they are situated."

The second resolution authorizes ministers of every grade in the Methodist Episcopal Church, to attach themselves, without blame, to the Church South. The six following resolutions relate principally to the book concern and the chartered fund, after first recommending to the Annual Conferences a modification of the constitutional restriction applicable to this particular subject, go on to provide, conditionally, for the equitable distribution of these properties between the two Churches. The

ninth resolution declares that all the property of the Methodist Episcopal Church, in Meeting Houses, parsonages, &c. &c., within the limits of the southern organization, shall be forever free from any claim set up on the part of the Methodist Episcopal Church, as far as this resolution can be of force in the premises. And the tenth allows to the Church so formed in the south, a common property in all copy rights, &c. &c.

The spirit of equity which pervades these resolutions, the care and caution with which they were evidently framed, the respect which they pay to constitutional restriction when it was supposed to apply, the deliberation with which they were considered and passed, the interesting circumstances which led to their introduction and the importance of the interests which they profess to regulate, all concur in giving to their adoption, as an assertion of power by the highest functionary of the Church, a weight of authority not easily overcome. To this is to be added the concurrence of the Bishops of the entire Church, who evinced their opinion of the validity of the resolutions by publicly recommending a proper method of taking and certifying the vote of the border societies, which they authorize. Then the precedents and more general considerations before odverted to, tend to establish in the General Conference the power involved in the passage of these resolutions. And the Southern Conferences having, in virtue of these resolutions, erected an extensive ecclesiastical organization, whose rights and jurisdiction are based upon their authority, we are by no means sure that a Court of Justice, a power outside of the Church, has a right to disturb the state of things sanctioned by such evidences of its legality, and by the acts and opinions of the highest tribunals of the Church, upon the ground of its own mere opinion that one of these tribunals has violated, not the law of the land, but the law or constitution of the Church. There would seem to be due from the tribunals of the civil government to those of the Church, at least so much respect as to require that the acts done by the latter, in the name of the Church, should be deemed valid under its law, and that the dependent right should be determined accordingly, until those acts

were reversed by the Church, or at least until they were conclusively demonstrated to be against its law. The evidences in favor of the validity of the act of the General Conference now in question, are so strong as almost to preclude the possibility of a conclusive demonstration against it, and certainly too strong to be overthrown by any doubtful construction.

Where the acts of the highest Church judicatory should even be of doubtful authority, and yet where the Church ratifies the act, the judiciary will be slow to interfere where discord instead of peace would be the consequence.

If the question of power were doubtful, we should be bound to regard the act of the General Conference as the act of the Church, and therefore as effectual. And if we even entertained the opinion that the late General Conference exceeded its power in attempting to authorize, in advance, the anticipated separation, still the Church might by its subsequent sanction, ratify the act and give full validity to its consequences; and as the question with the Church would be one not only of ecclesiastical law, but of ecclesiastical policy; and the same considerations which operated on the General Conference, might also bring the Church to the conclusion that its great objects would be better accomplished by two independent organizations, with jurisdiction territorially divided, than by attempting to maintain a nominal union of discordant elements, or by spreading over the same territory two Churches struggling for power in every congregation; it would be a serious question whether a Court, whose decision could not restore harmony and union to the Church, but might introduce local strife and discord and confusion, should not rather respect the existing state of things until the Church itself should act, or assume inaction, to be itself a sanction, than undertake to decide for the Church, whether it should be united or divided.

But as under every view of the question of power which has been presented to our minds, we have no serious doubt upon it, and as it may be of importance to the parties concerned, that the opinion of this Court and the grounds of it, should be expressed upon every point involved, we proceed to notice briefly, the constitutional restrictions supposed to bear upon it. The General Conference, in addition to other powers of a mixed character, is expressly vested with power to make rules and regulations for the Church, subject only to six restrictive clau-

ses contained in the rules and discipline. Of these, two only are urged as having application to the present subject.

The first of these clauses prohibits the General Conference from changing "any rule of our government, so as to do away Episcopacy, or destroy the plan of our itinerant general superintendency;" that is, the plan by which the Bishops of the Church are to travel through the entire connection, and to visit and act in all the Annual Conferences. But if it necessarily follows from the separate organization of a part of the Church, that the rights and duties of the Bishops are limited to the respective organizations to which they belong, this does not destroy the plan of itinerant superintendency, but leaves it in full force to the extent of each of the connections or organizations. The plan or principle referred to, may exist in full force, notwithstanding the reduced extent of the connection. Indeed, so far as its strict observance and salutary operation are concerned, these objects would seem to be hazarded rather by an extension than by a curtailment of the connection which would form the field of labor and of travel. And of this the history of the Church and of the General Conference bear testimony. But be this as it may, the plan was adopted when the connection was much less extensive than in 1844, and it may, and as we presume, does still exist in full activity and vigor in each of the two organizations of the Church. This clause, therefore, cannot operate either directly or by any admissible construction as a negation of the power to divide the Church, or to authorize the separation of a part.

The other restrictive clause relied on, declares that the General Conference shall not "do away the privileges of our ministers and preachers, of trial by a committee, and of an appeal, nor shall they do away the privileges of our members, of a trial before the society, or by a committee and of an appeal." According to the rules and discipline as existing before and since the separation, the appeal of ministers or preachers is to the General Conference, but in the case of a member, it is to the Quarterly Conference, or at most, to the Annual Conference. The ministers having a right, by the plan of sepa-

GIBSON *et al.*
*vs*
ARMSTRONG, &c

The first restriction relied upon in opposition to the power of the General Conference to divide the Church 'that they shall not do away Episcopacy or destroy the plan of our itinerant general superintendency.' Held not to be any restriction upon the power exercised.

The second, 'Nor do away the privilege of our ministers and preachers of trial by a committee and of an appeal; nor shall they do away the privilege of our members of a trial before the society, or by a committee, & of an appeal.' Held that this rule has no bearing upon the question of

ration, to take their place in either of the two connec-
tions, and thus to choose their own appellate tribunal,
there is no color for charging an invasion of their privi-
leges as secured by this clause.    And as the appeal of a
member does not reach the General Conference, it is not
affected by the introduction of two tribunals of that
name, with divided jurisdiction, in the place of one
whose jurisdiction comprehended the whole Church.
This clause, however, does not regulate the mode of trial,
nor fix the tribunal of appeal.    But securing the right
of trial by the society or by a committee, and the right
of appeal, it leaves the trial and appeal to be regulated in
other respects by the General Conference.    It relates ex-
clusively to the trial of individuals, ministers and mem-
bers, which might result in expulsion or other punish-
ment, personal to themselves, and does not touch the
power of the General Conference, as the legislative organ
of the Church, to prescribe and alter its local arrange-
ments, to regulate its organization, to withdraw its juris-
diction from a separating portion, or to assent to and
authorize such separation, when in the judgment of that
body it is deemed necessary or just.    No acts of the
General Conference seem to be more unquestionably
within its power than those by which it has from time to
time, and often fixed and changed at its own discretion,
the boundaries of various Annual Conferences, with the
effect of changing the position and proximate relations
of particular local societies and their preachers.    These
unquestioned acts of legislation, show that this clause
did not intend to secure to individuals the continuance
of the same appellate tribunal, but only the right to a
trial by the prescribed tribunal, and then to an appeal
to one of higher jurisdiction.                    .

VII. The resolutions constituting the plan of separa-
tion, do not expel any individual from the society of which
he was a member, nor deprive him of any privilege of
property or worship pertaining to that society.    But as
they propose and provide for a complete separation accor-
ding to the organic or territorial divisions of the Church,
they necessarily involve a partition of the governing pow-
er between two jurisdictions, each possessing within its

territorial limits, the same authority and power as had previously belonged to the whole Church.   A further necessary result is, that in some cases particular societies are placed under one or the other of these jurisdictions, against or without the consent of some of their members, who would have prefered a different position, or disapproved wholly of the separation.

The complainant and his associates being in this condition, deny the power of the General Conference thus to transfer them from one Church to another, without or against their consent.   But as the measure takes effect by the concurrent action of the General Conference and of the Annual Conferences to which the terms of separation were addressed, the real question is, whether this concurrent action was competent to determine the question of separation, and to define its limits without more particular reference to the will or opinion of the individual members.   If it was, then the reference to the vote of the border societies for determining the position of those societies, is a concession, which, operating of course according to its own terms, gave the power of determination to the majority, to which also it would have certainly belonged, if the vote were taken in the exercise of an unrestricted right in the members to determine the position of their society.

The complainants indeed seem not to rely upon the popular principle, which would refer a question affecting numerous individuals, to the decision of the majority, but rather upon some supposed indefeasible right of the individual members to, or in the unity and identity of the Church, and its jurisdiction or protection, which rising above all the powers of the Church, would enable a minority, however small, or perhaps a single individual, to obstruct or defeat, in a question of dismemberment, the will and action of the entire residue of the Church.   But we perceive no foundation for the assertion of such a right, in any provision or restriction of the Constitution, and the rights of individuals as founded in or measured by the duty of protection on the part of the entire association, or its governing power must yield, as we have seen, to those occasions which justify or require dismem-

GIBSON *et al.*
*vs*
ARMSTRONG, &c.

The Conference had the right to concede to the Church to determine by a majority, the branch of the divided Church to which the local Church at Maysville would adhere; (it might have determined that question without referring it;) the will of the majority then determines the jurisdiction to which the local Church was subject.   In this there was no violation of principle.

beiment, and which are to be authoritatively judged of, not by a minority nor by each individual member, but either by the majority of individual members or by that power which is authorized to act for the whole. To say that the Church could not be legally or rightfully divided according to its organic or territorial parts, without the unanimous consent of all the members of the entire Church, or even of all the members of the part proposed to be separated, would be to deny the power of division by any mode of action, since it would subject it to an impossible condition. And to say that a division could only take effect as to those individuals who should consent to it, and must be wholly ineffectual as to others, would not only change its character from an organic or territorial dismemberment, to a mere numerical or individual separation, but would frustrate one of the most useful objects of the power, by producing that confusion and discord, the avoidance of which is a just ground of its exercise.

In a measure of this kind, affecting the feelings if not the interest of numerous individuals, a diversity of sentiment may be expected even in the clearest case. Founded as such a measure should be, upon an enlarged view of both the general and local interest, these individual diversities must necessarily be merged in the general sense of interest and propriety to be ascertained by the voice of the majority of those concerned, to which the minority must yield, or by the action of the legitimate authority, which must be binding upon all. That the General Conference had a right to act for the whole Church in authorizing the separation and independence of the Southern Conferences, has been already sufficiently shown. And if that body might not also act for the part proposed to be separated, it has by the resolutions under consideration, recognized if not established the competency of the several Annual Conferences to decide the question for the portions of the Church within their respective jurisdictional limits. We are not to decide whether, in point of policy or discretion, it might have been better to refer the question, in each Conference, to the determination of a majority of the individual mem-

bers attached to it, but whether, according to the princi-
ples of the association, such a reference was essential to
the validity of the separation.   Without entering into any
detailed discussion of this question, which is perhaps not
relied on, it is enough to say that we have found nothing
in the history or practice or constitution of the Methodist
Episcopal Church, to prove that on this or any other
question affecting the general legislation or organization
or action of the Church, the individual members were
or are entitled to any direct voice or control.   On the con-
trary the power of the Church, not only under the consti-
tution but over it, resides in the ministers and preachers
of the Church, to be exercised in their General and An-
nual Conferences; and the other officers or private mem-
bers exercise only such portions of local power as are
vested in them by the legislation of the preachers.   It
was the preachers who framed the organization and con-
stitution of the Church, in virtue, not of a power dele-
gated by the individual members, but of a power original
in themselves or derived from ordination as preachers.
They have reserved to themselves the right of overcoming
or dispensing with the restrictions which they imposed
upon the delegated General Conference, of which they
and not the individual members, are the constituent
body.   And unless the preachers have, in some manner,
lost a portion of their original power, they can change or
unmake what they have constructed; and at any rate,
upon the dissolution of the general organization which
holds the several Annual Conferences in union, the ele-
mentary power would still be in the preachers, who might,
by entering into General Conferences more or less exten-
sive, re-construct one or more organizations, according to
their own sense of the interests of their respective char-
ges.   From their official and personal connection with
the different societies, the preachers should be presumed
to know and sympathise with the wants of these bodies
and their members, and would doubtless be disposed to
represent them truly, and to provide for them as far as the
general interests would allow.   But whether on this
ground or not, the body of preachers have power to act
for the body of members, and there is no where in the

system, any provision for ascertaining or effectuating the will of the members upon any general measure except through this agency of preachers, who are neither chosen by, nor responsible to them. It would seem clear, therefore, that there was no violation of the principles of the Methodist Episcopal association, in referring the question of separation to the decision of the preachers in their Annual Conferences. And although one or more Annual Conferences might be incompetent by their separate action, against the consent of the General Conference, to bind to an independent organization, the local societies connected with them, we are satisfied that the joint and co-operative action of the General Conference and the several Annual Conferences concerned, was fully competent to determine the question and fix the limits of separation, and to establish over the several societies within those limits, the jurisdiction of the new organization. The reference to the vote of the members for fixing the position of the border societies, though according to these views unnecessary and anomalous, yet being made by the authority of the General and Annual Conference, was unquestionably valid, and the decision of the majorities acting under it has the same authority as that of the Annual Conferences themselves.

VIII. But it is objected that the proceedings which have resulted in the erection of a southern organization, have not been such as under the resolutions, give to that organization the sanction of the General Conference. Without detailing the particular grounds of this objection, we shall proceed to answer them, premising that in determining upon the legality of the actual state of things consequent upon a great movement of this character, every part of the proceeding should be liberally construed to effectuate the apparent and reasonable intention of the parties, and there is no room for technicality. Then it is apparent upon the face of the resolutions that there is but one condition upon which the separation and the sanction of the General Conference are to depend, which is that the delegates from the slave-holding Conferences should find it necessary to erect an independent ecclesiastical connection, &c. The distribution of the book

concern and chartered fund is obviously intended to be a consequence of the separation and not a condition on which it is to depend. And the reference to the several Annual Conferences for a modification of the restrictive rule, was evidently for the purpose of authorizing the intended distribution, and not of authorizing the separation. The slave-holding Conferences referred to in the first resolution, are such as were situated wholly in the slave-holding States. And the delegates from all of these Conferences assembled in convention, having declared the necessity of separation and erected an independent ecclesiastical connection, the prescribed condition has been complied with. Even if the resolutions intended as the condition, that the delegates from the slave-holding Conferences then present in the General Conference, should find it necessary, there is no doubt that those delegates did deem it necessary; that they promoted the movement in favor of it, were members of the convention which declared it necessary, and concurred in the act. But we do not understand the resolutions as referring specially to these delegates, whose authority as such would expire with the session of the Conference, and who had no power under that authority, to erect an independent ecclesiastical connection for their constituents. As to the actual necessity for separation, that is, the existence of such a state of things as justified it or rendered it proper, this, if it could ever have been a judicial question, is no longer so. It has been decided by the concurring judgment of the General Conference and the southern or slave-holding Conferences, to which it was referred; and by the fact itself of an actual separation, by agreement between the whole, and the separating part which is presumptively the strongest evidence of a high expediency amounting to necessity.

But the separation having, as we have seen, been effected by competent powers in the Church, and under the condition and in pursuance of the plan prescribed by the General Conference, its legality in view of the civil tribunal, can be in no degree dependent upon the sufficiency, in point of discretion or policy, of the causes which led to it. It is sufficient that the Church, through its

GIBSON *et al.*
          *vs*
ARMSTRONG, &c.

same connection
had not the bor-
der    Churches
been allowed to
determine their
own position by
a vote of the so-
ciety.

competent agents, has authorized the separate organiza-
tion and independent self-government of the Southern
Conferences, and that they have so acted under the au-
thority, as to clothe their movement with the sanction of
the Church.  This being so, the southern Church stands
not as a seceding or schismatic body, breaking off vio-
lently or illegally from the original Church, and carrying
with it such members and such rights only as it may suc-
ceed in abstracting from the other, but as a lawful eccle-
siastical body, erected by the authority of the entire
Church, with plenary jurisdiction over a designated por-
tion of the original association, recognized by that Church
as its proper successor and representative within its lim-
its, commended as such to the confidence and obedience
of all the members within those limits, and declared to
be worthy of occupying towards them the place of the
original Methodist Episcopal Church, and of taking its
name.  Such, though not the express language, is the
plain and necessary import of the resolutions, in author-
izing the formation of a southern ecclesiastical connec-
tion or Church, and prescribing a rule for ascertaining its
limits; in leaving to the unmolested care of the antici-
pated Southern Church, all the societies, &c., within its
limits, and stipulating that within those limits no new
ones shall be organized under the authority of the Meth-
odist Episcopal Church ; in declaring that ministers may
take their place in the southern connection without blame,
and in denominating the Southern Church "the Church
South."  The provision made for a rateable distribution
of the funds of the Church, and the relinquishment of all
claim to the preaching houses, &c. within the limits of
the southern connection, are of a similar character with
the other features of the resolutions, and attest the equity
and magnanimity of the late General Conference.  That
body had, however, no proprietary interest in the preach-
ing houses, and could only transfer its jurisdiction over
them, which is done by the resolutions and the proceed-
ings under them.

The result is, that the original Methodist Episcopal
Church has been authoritatively divided into two Metho-
dist Episcopal Churches, the one North and the other

South of a common boundary line, which according to the plan of separation, limits the extent and jurisdiction of each; that each within its own limits is the lawful successor and representative of the original Church, possessing all its jurisdiction, and entitled to its name; that neither has any more right to exceed those limits than the other; that the Southern Church retaining the same faith, doctrine and discipline, and assuming the same organization and name as the original Church, is not only a Methodist Episcopal Church, but is in fact to the South, the Methodist Episcopal Church, as truly as the other Church is so to the North, and is not the less so by the addition of the word South to designate its locality. The other Church being by the plan of division, as certainly confined to the North as this Church is to the South of the dividing line, is as truly the Church North as the Southern Church is the Church South. The difference in name makes no difference in character or authority.

IX. The application of the deed to this state of things has already been explained; and it only remains to ascertain to which of these Churches the Maysville society, according to the plan of separation, belongs. The Annual Conference of Kentucky having adhered to the Southern connection, the Maysville society as a part of that Conference, would by that adherence have been placed in the same connection, had not the border societies been allowed to determine their own position by a vote of their members. The reference of the question to a vote, implies that according to common usage, the vote should be taken at a meeting of the members of the society. But the resolution having omitted all detail, these were supplied by the recommendation of the Bishops, who presented a plan of proceeding altogether proper, and according to the intent of the resolutions. In pursuance of this plan, a meeting of the Maysville society was held after due notice, and nearly all of the ascertained members of that society having been present, a majority decided in favor of remaining with the Kentucky Conference, in connection with the Southern Church, which was duly certified to that Conference. This meeting having been held upon regular notice, un-

der the authority of the entire Church, and for a lawful purpose well understood, and having been in fact unusually large, it might be assumed, upon ordinary principles, that those who did not attend were willing to submit to the decision of those who did, and that the vote of the majority present was the vote of a majority of all. For it is to be observed, that the resolutions do not give those who are absent to the vote on one side more than of the other, but require the decision either way to be by the vote of a majority. But the opinions of those who were absent from the meeting in this case having been canvassed, and it appearing that the actual majority of all the members concurs with the vote of the majority of those who were present, there is no room for further question or presumption.                    :

The members of the Maysville society of the Methodist Episcopal Church, have then, by the vote of a majority, placed that society in connection with the Southern division of that Church, and of course in subordination to its authority and jurisdiction. They have done this under the authority of that Methodist Episcopal Church, of which both the majority and minority through their membership in this society were members, and to which all once owed obedience. They have done it lawfully and without blame in the eye of the Church. The position in which they have thus placed the Maysville society, is therefore its lawful position, and neither the society itself, nor its members, are deprived of any right by this lawful act, which at least was not a rejection of their original condition, since the original Church had already been divided, but a choice between the two Churches which stood in its place, and a choice which resulted in retaining the Maysville society in the same Conference with which it had long been connected. The Kentucky Conference having been lawfully made a part of the Southern organization, it was only under the privilege conferred by the resolutions and by the vote of a majority of the Maysville society, that that society could rightfully have been taken out of the Kentucky Conference and placed in connection with a different organization. The majority having determined against such a

*The members of the Maysville society having determined by a majority, under the plan recommended by the Bishops, to adhere to the M. E. Church South, the ministers furnished by that organization and those adhering to that connection, have the right to the exclusive use of the church property.*

change, the minority certainly could not effect it by their own will, and the society remains rightfully within the limits and jurisdiction of the Kentucky Conference, bound under the authority of the rules and discipline, and of the General Conference, to receive its preacher from that source. That the resolutions constituting the law of the case, intended that the ministry should acquiesce in the determination of the majority, is manifest, not only from their general tenor and objects, but more especially from the failure to make any provision for a seceding minority, and from the express stipulation that the Church to which such minority might desire to adhere, shall organize no societies within the limits of the other.

Had the minority acquisced in the present instance, and remained in the society in which they had taken, and held their membership, it could not have been doubted that notwithstanding the division of the Church, and the adherence of the Maysville society to that portion which assumes the name of "the Methodist Episcopal Church South," (and not to that part which retains the name of "the Methodist Episcopal Church,") the entire society and its members would have been the true beneficiaries under the deed, entitled to the use of the property conveyed by it, beyond the power of disturbance by the present M. E. Church or its members. By attending the meeting and going into the vote, all who did so recognized the authority of the resolutions under which the proceeding took place, and submitted the position of the society to the result of the vote by which themselves and the society were placed in connection with the Southern Church. This implication of consent and of promised acquiescence in the determination of the majority, renders more obvious the conviction that the minority could not by their subsequent separation from the society, change its character or position, or impair the rights of its members. These, however, were fixed, not by the concession or acquiesence of the minority, but by the authority of the General Conference of the Methodist Episcopal Church, and by the action of the society under that sanction. And the minority having separated from the society and formed a new organization not authorized by

*The minority having by their assent to the vote, and submitting the question to the decision of the majority, acknowledged legitimacy of the mode of determination by a majority, are estopped to deny the authority of the tribunal to which they submitted, and having now separated from the majority, they have no right to the use of the property for any portion of the time for religious purposes.*

the General Conference, but in defiance of the rule which it had prescribed for the case, and having rejected the preacher from the Kentucky Conference, to which the society legally belongs, and taken one from the Ohio Conference, to which it does not belong, it is clearly the minority and not the majority, that in view of the law of the Church, is in an illegal attitude. The individuals of the minority had the undoubted right, as individuals, to quit the society of which they had been members, to reject the Church with which they had connected themselves, and to form a new society, under such connections or protection as they might find willing to receive them. If they could have done this without violating the law and authority of the Methodist Episcopal Church to which the entire society was subject, they would still have lost thereby, all rights belonging peculiarly to that society and its members; and much more when they have done it in violation of the law of the Church. Having separated from the majority on the very ground of unwillingness to maintain the true position, relations and subordination appropriate to the entire society, and which are maintained by the majority, the minority can have no just pretension to be regarded as being itself the true original society, or a lawful continuation of it, but the majority is manifestly entitled to be so considered. And the property conveyed and held for the use of the members of the original society, as members of the Methodist Episcopal Church, having by the deed, been subjected to the same authority and laws to which the society and its members entitled to the use were subject, it follows that the same legislation and the action under it, which have determined the true position and relations of the society entitled to the use, have also determined the authority to which the use itself is properly subject, and have placed the use under the jurisdiction and legislation of the Southern Church. Whether the society instituted by the minority has been or shall be regularly received in connection with the present Methodist Episcopal Church, and whether its members have continued to be or shall become members of that Church, is immaterial to the question of property now involved, nor is it deemed essential to inquire how-

far the present Methodist Episcopal Church is identical with the original Church of that name.  It is sufficient for the purposes of this case to have ascertained that the Methodist Episcopal Church South has, within the limits of its organization as fixed under the rule prescribed by the General Conference of the original Church, all the rights and jurisdiction of that Church, to the exclusion of the present Methodist Episcopal Church; that the Maysville society, and property secured to its use for worship, are under the jurisdiction, not of that Church, but of the Methodist Episcopal Church South, and that while one of the parties now contending, submits to that jurisdiction and would hold the property in subordination to it, the other repudiates it and would place the property in subjection to a different authority.  It has already been sufficiently shown, that the addition of the word, South, to the name of the Southern Methodist Episcopal Church cannot affect the rights either of that Church or of its members, and that the members of a local society entitled to the use of local property under this or other similar deed before the division, do not lose their right by adhering to the Methodist Episcopal Church South, under the resolutions of the General Conference of 1844. Without further recapitulation, we conclude that the majority of the Maysville society, with their preacher from the Kentucky Conference, is entitled to the use of the property in contest, to the exclusion of the minority, whose members would, as we understand, be willingly admitted to the common use of the premises as members of that society, but have no proprietary right as a distinct and independent body.

The decree is reversed and the cause remanded, with directions to render a decree declaring the exclusive right to the use of the lot in question, and of the buildings thereon, and especially of the house erected thereon for the purpose of divine worship, to be in the defendants and their associates, constituting the Methodist Episcopal Church or society at Maysville, adhering to the Methodist Episcopal Church South, with their preacher appointed to preach therein, under the authority of the said Methodist Episcopal Church South, and not in the complain-

ant and those represented by him in their organized form, as constituting a society or congregation professing adherence to the Methodist Episcopal Church; and thereupon to dissolve the injunction herein, and to dismiss the bill, thus leaving the defendants and their society in possession, as they were when the bill was filed.

*Robertson, Hord and Stanton* for Gibson, &c.; *Waller and T. M. Smith* for Armstrong.